[No. 61224-2. En Banc. December 22, 1994.]

WASHINGTON MUTUAL SAVINGS BANK, *Respondent*, v. RICHARD C. HEDREEN, ET AL, *Petitioners*.

522

*Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* by *Daniel P. Pepple* and *Jackson Schmidt; Edwards, Sieh, Wiggins & Hathaway,* by *Howard M. Goodfriend,* for petitioners.

*Foster Pepper & Shefelman, Charles P. Nomellini,* and *Clifford M. Curry,* for respondent.

DOLLIVER, J. — Richard and Elizabeth Hedreen challenge the unpublished decision of the Court of Appeals, Division One, affirming the trial court's reformation of a lease, into which they entered with Hedreen Company, to accord with a loan commitment letter issued to them by Washington Mutual Savings Bank. *See Washington Mut. Sav. Bank v. Hedreen,* noted at 71 Wn. App. 1019 (1993). They also challenge the trial court's ruling, affirmed but not discussed by the Court of Appeals, holding them personally liable to the bank for unpaid loan payments.

Jefferson Square is a mixed-use development in West Seattle, completed in 1987, which includes office, retail, and residential space. Defendants Richard and Elizabeth Hedreen (hereinafter Hedreen) are the developers. Upon completion of the development, Hedreen applied for a $13 million loan from Plaintiff Washington Mutual Savings Bank (hereinafter Washington Mutual) to permanently finance the retail and office portions of the project. The bank approved Hedreen's application and on September 24, 1987, it issued a commitment letter detailing the terms of the loan. Hedreen signed the commitment letter on October 4, 1987. The letter provided, *inter alia,* that (1) the loan was to be evidenced by a promissory note, and (2) Hedreen was to execute a "Master Lease" with R.C. Hedreen Company for all the office space unleased on the date of closing. R.C. Hedreen Company is a corporation, wholly owned by Hedreen.

Hedreen's chief financial officer prepared the Master Lease. It covered 24,525 square feet of office and retail space. The total amount of such space in the project equals 56,766 square feet. The difference represented space on which leases either shortly were to be finalized or were being negotiated. The Master Lease was forwarded to Washington Mutual on November 6, 1987, for review. A bank employee reviewed the Master Lease, but did not compare it to the leases that Hedreen had executed with tenants other than R.C. Hedreen Company, to determine if it actually covered all of the space not covered by those leases. Moreover, a bank attorney who reviewed the Master Lease failed to notice that the amount of space leased fell short of that required by the commitment letter.

Closing occurred on December 21, 1987, at which time Hedreen executed and delivered to Washington Mutual a promissory note. Hedreen did not bring the discrepancy between the Master Lease and the commitment letter to the attention of the bank at the time of the closing. Due to financial difficulties that resulted from his inability to secure tenants for the unleased space, Hedreen defaulted on the loan and ceased making payments on it in October 1989. At that time, Washington Mutual discovered the discrepancy between the Master Lease and the commitment letter. Accordingly, the bank filed an action against Hedreen for reformation of the Master Lease or, in the alternative, for breach of the commitment letter. Washington Mutual contended that if successful on either of these theories, it would be entitled to recover from Hedreen approximately $857,000, which equals the additional amount Hedreen would have collected in rent had the Master Lease been written to cover all 56,766 square feet of office and retail space. The bank based this contention on the premise that it would have received those rental payments from Hedreen as loan payments if the Master Lease had initially been written in accordance with the commitment letter.

After reviewing the evidence, the trial court was convinced that Washington Mutual intended the Master Lease

to cover all office space unleased at the time of the closing, and that Hedreen was aware of this intention. That court also found that Hedreen had represented to the bank that the Master Lease would cover all of the unleased space. The court therefore concluded both that Hedreen had a duty to inform the bank of the discrepancy between the Master Lease and the commitment letter, and that Hedreen breached this duty. Accordingly, the trial court found Hedreen culpable of inequitable conduct, and granted Washington Mutual's request to reform the Master Lease to cover all 56,766 square feet of unleased office and retail space as specified in the commitment letter. Additionally, the court subscribed to Washington Mutual's point of view that it was entitled to recover from Hedreen the $857,000 that Hedreen would have received had the Master Lease been drafted in accordance with the letter. Therefore, it held Hedreen personally liable for this amount. The Court of Appeals, Division One, affirmed the trial court rulings. Subsequently, Hedreen petitioned this court for review.

In pursuing its claim against Hedreen, the trial court also found that Washington Mutual incurred reasonable attorney fees in the amount of $258,450. The trial court therefore concluded that Washington Mutual is entitled to recover those fees as the prevailing party. Accordingly, that court entered a personal judgment against Hedreen for the aforementioned amount. The Court of Appeals, Division One, affirmed the trial court's judgment without elaborating upon it. Hedreen requested this court to review this ruling.

■ Hedreen submits that the trial court erred in reforming the Master Lease. A party to a contract is entitled to reformation of the contract if either there has been a mutual mistake or one party is mistaken and the other party engaged in fraud or inequitable conduct. *Gammel v. Diethelm*, 59 Wn.2d 504, 507, 368 P.2d 718 (1962); *Kelley v. Von Herberg*, 184 Wash. 165, 174, 50 P.2d 23 (1935). Washington Mutual argues that the trial court correctly reformed the Master Lease because the bank was mistaken as to the coverage of the Master Lease and Hedreen engaged in inequitable conduct.

■ A party has engaged in fraud or inequitable conduct if it conceals a material fact from the other party. *Kelley*, at 174. However, concealment only constitutes fraud or inequitable conduct when the party possessing the knowledge has a duty to disclose that knowledge to the other party. *Oates v. Taylor*, 31 Wn.2d 898, 904, 199 P.2d 924 (1948); *Kelley*, at 174-75.

■ Washington Mutual contends that Hedreen had a duty to inform Washington Mutual at closing that the Master Lease did not cover all unleased office space. We agree. In general, "[s]ome type of special relationship must exist before the duty [to inform] will arise." *Colonial Imports, Inc. v. Carlton Northwest, Inc.*, 121 Wn.2d 726, 732, 853 P.2d 913 (1993). In those cases where a court has found a duty to disclose, the circumstances surrounding the transaction have created a relationship of trust and confidence upon which the injured party was entitled to rely. *Kelley*, at 175. Few Washington cases addressing reformation of a contract have focused on the duty to disclose issue. The following cases provide some guidance as to whether a duty to disclose has arisen in the instant case: *Kaufmann v. Woodard*, 24 Wn.2d 264, 163 P.2d 606 (1945); *Kelley v. Von Herberg, supra; Waite v. Salestrom*, 201 Neb. 224, 266 N.W.2d 908 (1978).

Hedreen relies primarily upon *Kelley* to support his position that he did not have an affirmative duty to disclose. In *Kelley*, a lessee leased a plot of land from a lessor with the intention of constructing a building on it. The lease contained a provision allowing the lessee to assign the lease after completion if he was not in default, but did not contain any provision regarding his liability upon assignment.

Prior to signing the lease, the parties had engaged in extensive negotiations regarding its terms. Throughout the negotiations the lessor assured the lessee that he would not be held liable on the lease upon assignment. The lessor prepared the lease. However, he did not include a provision that reflected his assurances. After construction was complete the lessee assigned the lease. He subsequently defaulted on the lease payments.

The lessor brought an action to recover past due rent. In response, the lessee requested that the court reform the lease to conform with the lessor's initial oral assurances. The lessee argued that the lessor was obligated to inform the lessee before execution that the lease did not contain a provision releasing the lessee from liability upon assignment. The court concluded that the lessor did not have such an affirmative duty because the parties dealt at arm's length and had access to the same means of acquiring information. Specifically, both parties had the opportunity to read the lease before signing it.

It is not clear whether the parties in *Kelley* reached an agreement regarding the lessee's postassignment liability prior to the execution of the lease. If the parties did not enter such an agreement with respect to this issue, *Kelley* would be inapplicable to the present case, in which the parties did indeed reach a preliminary agreement regarding the coverage of the Master Lease. However, even if the parties in *Kelley* are viewed to have entered a preliminary agreement, we decline to follow *Kelley* in the instant case for two reasons. First, *Kelley* is a plurality opinion in which only three justices voiced their belief that the lessor did not have a duty to inform the lessee that he would remain liable upon assignment. Second, and more importantly, *Kelley* directly conflicts with the decision of this court in *Kaufmann v. Woodard, supra. Kaufmann,* a case not cited by either of the parties in this action, was decided by this court 10 years after *Kelley.*

In *Kaufmann,* a seller contracted to sell two plots of land to a buyer. One of the plots was encumbered by a mortgage. Subsequently, the mortgagee of that plot and the seller negotiated an agreement which indicated that the mortgagee would release the seller from his obligations on the mortgage in exchange for assignment of the contract of sale into which the seller had entered with the buyer. Both parties understood that the assignment was to include the entire contract of sale, which encompassed both of the plots. The seller prepared the documents effecting the assignment. In doing so, he only included one of the two plots that were the

subject of the sale contract. Because the mortgagee and the seller had previously transacted business, the mortgagee did not review the assignment documents before he signed them. The mortgagee subsequently sued to have those documents reformed to include both plots. This court affirmed the trial court's reformation of the documents, concluding that the seller had a duty to inform the mortgagee that the documents he had prepared covered only one plot.

One decision from outside Washington, *Waite v. Salestrom, supra*, is directly on point. In *Waite*, a seller and a buyer entered a written option agreement which gave the buyer the right to purchase the seller's land for a specified sum. A provision of the agreement stated that the seller agreed to subordinate his lien on the land to that of any party lending funds to the buyer to purchase the property. The buyer exercised the option.

The final documents were prepared by attorneys representing all parties. The terms of those documents did not conform to the subordination provision of the option. Instead, the documents provided for a series of deeds of trust and notes to be executed. However, all parties apparently agreed to this alternative structure of the transaction. After being drafted, the deeds of trust and notes were presented to the buyer for signature. Prior to signing them, the buyer added the phrase "without recourse" to the note in order to relieve him of any personal liability. He did not inform the seller of the change, but expected him to object if it was not satisfactory. The seller executed the documents without noticing the change.

Subsequently, the seller sued to reform the note to exclude the phrase "without recourse". The trial court granted the reformation and the Nebraska Supreme Court concluded that the buyer had a duty to inform the seller that he had altered the note. The court based its conclusion on the existence of a prior agreement between the parties, as evidenced by the option contract, which held the buyer personally liable. The court noted that the substance of that contract was

not altered by the subsequent modification of the structure of the transaction.

The decisions of the *Waite* and *Kaufmann* courts are controlling in the present case. Like in *Kaufmann* and *Waite*, the parties in the instant case entered into a preliminary agreement, had equal access to information, and negotiated at arm's length. Washington Mutual and Hedreen executed a commitment letter which both parties understood to require Hedreen to enter a master lease with Hedreen Company covering all of the unleased office space in Jefferson Square. The commitment letter was negotiated by Washington Mutual and Hedreen, both of whom are sophisticated parties. Hedreen is a real estate developer, and Washington Mutual is a bank in the business of making loans. Moreover, both parties had an opportunity to review the final loan documents before they signed them.

Therefore, Hedreen had a duty to inform Washington Mutual about the discrepancy between the Master Lease and the commitment letter. He failed to do so. Thus, he has engaged in inequitable conduct. Accordingly, Washington Mutual is entitled to have the Master Lease reformed to accord with the commitment letter.

Hedreen contends that even if he breached his obligation to inform Washington Mutual about the discrepancy between the commitment letter and the Master Lease, he cannot be held liable for the resulting damages because the bank was negligent in not carefully reading the lease to discover the discrepancy before signing it. The courts of Washington, as well as those of other jurisdictions, are in agreement that negligence is not a bar to reformation of a contract when the reformation claim is based upon mutual or unilateral mistake. *See, e.g., Meyer v. Young*, 23 Wn.2d 109, 113, 159 P.2d 908 (1945); *Carlson v. Druse*, 79 Wash. 542, 548-49, 140 P. 570 (1914); *Home Stake Prod. Co. v. Trustees of Iowa College*, 331 F.2d 919, 921 (10th Cir. 1964). In discussing the availability of reformation as a remedy when there has been a unilateral mistake, the *Gammel* court stated the "[f]act that the first party was negligent in

failing to observe that the writing does not express what he has assented to does not deprive him of this remedy". *Gammel v. Diethelm*, 59 Wn.2d 504, 508, 368 P.2d 718 (1962) (quoting 3 Arthur L. Corbin, *Contracts* § 614, at 730 (1960)). Similarly, the *Daly* court has stated:

> Reformation will be granted when there is a mistake on the part of one of the parties as to the content of a document and there is fraud or inequitable conduct on the part of the other party. It is not determinative that the mistaken party could have noticed the discrepancy between his understanding and the written agreement by reading the documents. . . .

(Citations omitted.) *Mitchell Int'l Enters., Inc. v. Daly*, 33 Wn. App. 562, 565, 656 P.2d 1113, *review denied*, 99 Wn.2d 1021 (1983).

> "It is not essential, therefore, that one seeking the aid of a court of equity to reform a contract show that he is wholly free from fault. Mere negligence not rising to the dignity of a violation of a positive legal duty, as negligence that is a mere inadvertence, does not preclude relief. Nor will relief be denied where, in the circumstances, the negligence of the party seeking relief is excusable."

*Meyer*, at 113 (quoting 45 Am. Jur. *Reformation of Instruments* § 78, at 632 (1943)).

Additionally, in *Waite v. Salestrom*, 201 Neb. 224, 231, 266 N.W.2d 908 (1978), the court noted that "[m]ere carelessness, however, is not necessarily a defense to an action for reformation." The case law is in accord with the Restatement of Contracts, which states:

> A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

Restatement (Second) of Contracts § 157 (1979). Comment b to this section of the Restatement explains the circumstances under which it is applicable.

> The exceptional rule stated in the present Section with regard to reformation has no application to the common case in which the term in question was not the subject of prior negotiations. It only affects cases that come within the scope of § 155, under

which there must have been an agreement that preceded the writing. In such a case, a party's negligence in failing to read the writing does not preclude reformation if the writing does not correctly express the prior agreement. . . .

Restatement (Second) of Contracts § 157 cmt. b.

If negligence were a defense to a reformation claim, then reformation would almost never be available as a remedy because mistake is most frequently a basis for reformation, and negligence generally results from mistake. *Carlson v. Druse*, 79 Wash. 542, 548, 140 P. 570 (1914); *Home Stake*, at 921. This rationale for allowing reformation when negligence has occurred is also espoused by the authors of the Restatement.

> The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude either avoidance or reformation. Indeed, since a party can often avoid a mistake by the exercise of such care, the availability of relief would be severely circumscribed if he were to be barred by his negligence. . . .

(Citations omitted.) Restatement (Second) of Contracts § 157 cmt. a.

Hedreen cites a number of cases, including *Yakima Cy. (W. Vly.) Fire Protec. Dist. 12 v. Yakima*, 122 Wn.2d 371, 858 P.2d 245 (1993); *Skagit State Bank v. Rasmussen*, 109 Wn.2d 377, 745 P.2d 37 (1987); and *National Bank v. Equity Investors*, 81 Wn.2d 886, 506 P.2d 20 (1973), for the proposition that "a party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents." *Skagit State Bank*, at 381 (quoting *Equity Investors*, at 912). None of these cases deal with the issue of reformation. As previously discussed, reformation is a unique remedy available under limited circumstances. Although negligence may bar other remedies, it is clear that it does not bar reformation except under extreme circumstances, which include a failure to act in good faith or to abide by reasonable standards of fair dealing. Hedreen does not contend that either of these extreme circumstances exists. Therefore, the aforementioned cases and the rule for which they are cited are inapplicable to the present case.

Hedreen further asserts that even if this court upholds the trial court's reformation of the Master Lease, he cannot be held personally liable on it. This argument is without merit. Section 10 of the promissory note signed by both Richard and Elizabeth Hedreen states:

> If default is made in the payment of any amount payable hereunder when due . . ., then, at the option of holder, the entire indebtedness evidenced hereby shall become immediately due and payable . . ..

Furthermore, based on this note the trial court found:

> RCH is liable to Hedreen for additional rental amounts owed under the Master Lease as reformed commencing as of December 21, 1987. Hedreen, in turn, is personally liable to Washington Mutual for the same additional amounts owed after Hedreen's default on October 1, 1989, pursuant to the Promissory Note and the Deed of Trust.

Finding of fact 32.

> In accordance with the terms of the Master Lease as reformed and the Deed of Trust and the Promissory Note, Washington Mutual is entitled to recover from Hedreen personally . . . in the total amount of $857,025.

Finding of fact 35.

Hedreen also contends that he is not personally liable to Washington Mutual for the $258,450 in attorney fees that Washington Mutual expended in litigating its claim because section 11 of the promissory note limits his personal liability. This contention also lacks merit. Section 11 of the note provides in part:

> [T]he real property and other collateral provided for in the Deed of Trust (collectively, the "Property") shall be the sole recourse of holder in the event of a default hereunder or under the Deed of Trust and that the liability of Borrower for any amounts due hereunder and/or the Deed of Trust is limited to their interest in the Property.

However, as Washington Mutual has pointed out, that section of the note also provides:

> The foregoing notwithstanding, holder shall have full recourse against Borrower for the full payment of: . . . (viii) attorneys' fees and other costs incurred by holder in collecting any of the foregoing.

Hedreen is also personally liable under the promissory note for the attorney fees that Washington Mutual reasonably incurred in pursuing its appeals to the Court of Appeals and this court. We remand to the trial court for a determination of this amount.

Affirmed.

ANDERSEN, C.J. and UTTER, BRACHTENBACH, DURHAM, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.